**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>Michael L. Pettigrew</u>

    **v.**                        Case No. 11-cv-167-PB
                                       Opinion No. 2011 DNH 180

<u>Michael J. Astrue, Commissioner,</u>
<u>Social Security Administration</u>


<u>**MEMORANDUM AND ORDER**</u>

Michael Pettigrew seeks judicial review of a decision by
the Commissioner of the Social Security Administration denying
his application for disability insurance benefits.  Pettigrew
contends that the Administrative Law Judge ("ALJ") who
considered his application did not adequately assess the medical
opinions of Pettigrew's treating providers and that the ALJ's
assessment of Pettigrew's credibility is not supported by
substantial evidence.  For the reasons provided below, I affirm
the Commissioner's decision.


**I.   <u>BACKGROUND</u>**[1]

Pettigrew applied for disability insurance benefits on
January 14, 2009, when he was thirty-six years old.  He alleged
a disability onset date of September 3, 2008, due to thyroid

---

[1] The background information is taken from the parties' Joint
Statement of Material Facts.  <u>See</u> L.R. 9.1(b).  Citations to the
Administrative Transcript are indicated by "Tr."

cancer, chronic fatigue syndrome,[2] and an adjustment disorder with depressed mood.[3]  After graduating from high school, he served in the U.S. Marine Corp from 1991 until 1995, when he was honorably discharged.  He subsequently worked as a mail handler and a plumber/solderer.

**A.    Pettigrew's Physical Impairments**

Pettigrew was diagnosed with papillary thyroid cancer in 1995, while stationed as a Marine at Camp LeJeune in North Carolina.  He had a cancer recurrence in December of 2006 on the left side of his neck, requiring surgical removal.  On March 20, 2007, Dr. Christopher Knox, who removed the cancerous nodule, noted that Pettigrew was "doing well," but that he would require regular monitoring for the rest of his life.

---

[2] Chronic fatigue syndrome ("CFS") is "a syndrome of persistent incapacitating weakness or fatigue, accompanied by nonspecific somatic symptoms, lasting at least 6 months, and not attributable to any known cause."  Stedman's Medical Dictionary at 1894 (28th ed. 2006) ("Stedman's").

[3] Adjustment disorder is "a disorder the essential feature of which is a maladaptive reaction to an identifiable psychological stress, or stressors, that occurs within weeks of the onset of the stressors and persists for as long as 6 months; the maladaptive nature of the reaction is indicated by impairment in occupational [] functioning, or in usual social activities or relationships with others . . . ."  Stedman's at 567.

On November 8, 2007, Dr. Knox observed a small lesion on
Pettigrew's neck and suggested that it be monitored for six
months.  As of April 3, 2008, however, Dr. Knox did not find any
evidence of cancer recurrence.  On May 12, 2008, Pettigrew
reported that he was doing fairly well, but explained that he
was feeling slightly tired.  An ultrasound of the neck revealed
two small masses.  Dr. Knox recommended continued monitoring,
noting that the masses appeared stable and did not warrant
surgery.  On September 11, 2008, Dr. Knox explained that
Pettigrew had not been cancer-free since 1995, and that his
aggressive form of papillary cancer required regular monitoring.

On September 3, 2008, Pettigrew reported to Dr. G. Joshi
that he was experiencing fatigue, loss of energy, and pain.  He
explained that he was ambulatory and able to manage his self-
care, but noted that he was incapable of normal activity.

On November 10, 2008, Dr. Paul Tung, Pettigrew's
endocrinologist, noted that an ultrasound still demonstrated two
small nodules in Pettigrew's neck, but explained that Dr. Knox
had opined that no surgical intervention was needed, as those
nodules appeared stable.  Pettigrew reported that, overall, he

had been feeling well.  Dr. Tung instructed Pettigrew to follow up in six months.

On January 7, 2009, Dr. Joshi diagnosed Pettigrew with chronic fatigue syndrome.  At that time, Pettigrew reported that he was exercising five to ten times a week, and that the exercise included the use of weights.  On the same date, Pettigrew met with Dr. Tung, who explained that Pettigrew's thyroid cancer was fairly stable and that he was on an unorthodox treatment regimen of thyroid hormone replacement therapy and suppression therapy.

On April 16, 2009, at a follow-up appointment with Dr. Tung, Pettigrew reported increased dizziness, increased appetite, trouble sleeping, shortness of breath, and irritability.  He explained, however, that he began feeling calmer and sleeping better after an adjustment was made to his thyroid suppression regimen.  Pettigrew added that he had been experiencing no dysphagia[4] or neck pain.  On May 11, 2009, however, Pettigrew reported to Dr. Tung that he was not feeling well, and explained that he was feeling tired.  Accordingly, Dr. Tung adjusted his medication cycle and changed the dosage.

---

[4] Dysphagia is "[d]ifficulty in swallowing."  Stedman's at 599.

4

On June 2, 2009, Dr. Matt Masewic reviewed Pettigrew's medical records for the New Hampshire Disability Determination Service, and concluded that Pettigrew's physical impairment was not severe.  Dr. Masewic explained that Pettigrew's papillary thyroid cancer, initially diagnosed in 1995 with one recurrence in 2007, was not a metastatic disease[5] and required no ongoing treatment apart from thyroid replacement therapy and continued monitoring.  He added that the medical evidence revealed no evidence of irritable bowel syndrome or functional loss secondary to Epstein-Barr virus.  Dr. Masewic concluded that there was insufficient evidence to support a diagnosis of chronic fatigue syndrome, and that the fatigue Pettigrew reported was more likely related to depression.

On November 10, 2009, Pettigrew continued to report feeling tired, but informed Dr. Tung that he had not adhered to the medication cycle change that Dr. Tung had instituted in May of 2009.  On January 7, 2010, Pettigrew reported that he had implemented the recommended medication changes, and that since then he had experienced no symptoms apart from some shortness of

---

[5] Metastasis is defined as "[t]he shifting of a disease or its local manifestations, from one part of the body to another." Stedman's at 1195.

breath.  Dr. Tung noted that Pettigrew's thyroid cancer remained fairly stable and that Pettigrew felt comfortable on his existing medication regimen.

Pettigrew began treatment with Dr. Charles Brummer on March 2, 2010.  Pettigrew primarily complained of chronic fatigue syndrome.  On March 26, 2010, Dr. Brummer offered an opinion regarding Pettigrew's residual functional capacity since September of 2008.  He opined that Pettigrew could lift and carry 10 and 20 pounds occasionally, and that he could sit, stand, and walk for one hour each in an 8-hour workday.  Dr. Brummer supported these limitations by explaining that Pettigrew had classic and severe chronic fatigue syndrome, resulting in overwhelming fatigue, lack of stamina, diffuse aches, severe irritability, dizziness, and an inability to complete tasks, concentrate, or think clearly.  Dr. Brummer also limited Pettigrew to occasional use of his dominant hand and right foot.

## B.   Pettigrew's Psychological Impairments

On September 3, 2008, Pettigrew reported to Dr. Joshi that he had been experiencing persistent depression for the prior six months.  Except for an observation that he was anxious, the result of his objective mental exam was normal.

6

On November 24, 2008, Dr. Joshi diagnosed Pettigrew with depression.  Dr. Joshi noted that Pettigrew had intermittent depression since 1995, when he served in the Marines.  During the visit, Pettigrew complained that he was experiencing a depressed mood, insomnia, fatigue, loss of energy, a diminished ability to concentrate, and a lack of interest.  Upon examining him, Dr. Joshi noted that Pettigrew was anxious and depressed, and displayed a flat affect.  His judgment, insight, and speech were normal.

At a follow-up appointment on January 7, 2009, Dr. Joshi described Pettigrew as anxious, but not depressed.  He was oriented to time, place, and person; did not have suicidal ideation; was not fearful; denied hopelessness; had no increased activity; was not agitated; had no paranoia or pressured speech; and had normal insight and judgment.

On May 22, 2009, the Social Security Administration sent Pettigrew to a mental consultative examination with Dr. Paul E. Downey.  Dr. Downey noted that Pettigrew was oriented and displayed normal speech, affect, thinking, memory, insight, judgment, and cognitive ability.  Dr. Downey also noted that Pettigrew's mood was despairing.  Based on his observations and

7

exam findings, Dr. Downey explained that Pettigrew was able to stay focused in conversation and understand and respond appropriately to questions and instructions; manifested good social skills and appeared able to communicate and interact appropriately with others; appeared well focused during his interview and able to sustain attention to complete tasks; and appeared able to cope with work demands, including decision making, attendance, maintaining schedules, and interacting appropriately with others.  Dr. Downey diagnosed Pettigrew with an adjustment reaction with depressed mood.

On June 25, 2009, Dr. Nicholas Kalfas reviewed Pettigrew's records gathered by the Social Security Administration pertaining to his mental impairments, and completed a psychiatric review technique form.  Relying on Dr. Downey's findings, Dr. Kalfas opined that Pettigrew's mental impairment was not "severe," as it caused only mild levels of limitation.

On March 26, 2010, Dr. Brummer offered his opinion regarding Pettigrew's mental residual functional capacity.  He opined that Pettigrew's chronic fatigue syndrome resulted in a variety of marked and extreme mental limitations that would preclude unskilled work and require a finding of disability.

8

Specifically, he noted that Pettigrew had marked difficulty understanding, remembering, and carrying out simple instructions; making judgments on simple work-related decisions; interacting appropriately with the public; and responding appropriately to usual work situations and changes in a routine work setting.  Tr. 292-93.  Dr. Brummer added that Pettigrew had extreme difficulty interacting appropriately with supervisors and co-workers.  Tr. 293.

## C.  **Administrative Proceedings**

After his claim for disability insurance benefits was denied at the initial level, Pettigrew requested a hearing before an ALJ.  Pettigrew attended the hearing on October 15, 2010, and testified.  He was represented by counsel.  A vocational expert also testified.

Pettigrew testified that he was diagnosed with Epstein-Barr virus in 1998, which led him to develop symptoms of incredible exhaustion, irritable bowel syndrome, dizziness, and headaches, among others.  Tr. 30-31.  He later explained that those are symptoms of chronic fatigue syndrome, which is caused by the Epstein-Barr virus.  Id. at 38.  He was treating the symptoms by resting and avoiding stress, because there is no treatment for

9

the virus.  Id. at 32.  He added that he had to lie down
constantly throughout the day to obtain relief.  Id. at 31.
Pettigrew also testified that he suffered from thyroid cancer
and that the Department of Veterans Affairs found him 100%
disabled due to this service-related condition.  In addition, he
stated that he was suffering from depression.  He explained that
at some point he was taking medication to treat his depression,
but that he stopped because the medication made him feel more
fatigued.  Pettigrew also testified that he does not do much on
a day-to-day basis.  He explained that he rarely leaves his home
and spends most of his day resting.

The ALJ issued a decision denying Pettigrew's claim on
November 10, 2010.  At Step Two of the sequential analysis, the
ALJ found that Pettigrew had the following severe impairments:
papillary thyroid cancer, chronic fatigue syndrome, and an
adjustment disorder with depressed mood.  At Step Three,
however, the ALJ found that Pettigrew did not have an impairment
or a combination of impairments that met or medically equaled a
listing.  The ALJ went on to find that Pettigrew retained the
residual functional capacity ("RFC") to perform light capacity
work that would be simple, routine, free of fast-paced

production requirements, isolated from the public, and involving
only occasional interactions with supervisors and co-workers.
At Step Four, the ALJ concluded that Pettigrew could perform his
past relevant work as a solderer.  Accordingly, the ALJ found
that Pettigrew was not disabled for the purpose of his social
security application.  The ALJ's decision became the
Commissioner's final decision on February 14, 2011, after the
Decision Review Board failed to complete a timely review.

## II.  <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I am authorized to review the
pleadings submitted by the parties and the transcript of the
administrative record and enter a judgment affirming, modifying,
or reversing the "final decision" of the Commissioner.  My
review is limited to determining whether the ALJ used "the
proper legal standards and found facts [based] upon the proper
quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d
652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference
as long as they are supported by substantial evidence.  Id.

Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion." Id. at 770.

Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record. Ortiz, 955 F.2d at 769. It is the role of the ALJ, not the court, to resolve conflicts in the evidence. Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. The applicant bears the burden, through the first four steps, of proving that his impairments preclude him from working. Freeman v. Barnhart, 274 F.3d 606,

12

608 (1st Cir. 2001).  At the fifth step, the ALJ determines
whether work that the claimant can do, despite his impairments,
exists in significant numbers in the national economy and must
produce substantial evidence to support that finding.  Seavey v.
Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III.  ANALYSIS

Pettigrew moves to reverse and remand the decision denying
his application for disability benefits on the grounds that the
ALJ did not adequately assess the medical opinions of
Pettigrew's treating providers, and that the ALJ's assessment of
Pettigrew's credibility is not supported by substantial
evidence.  In response, the Commissioner argues that the ALJ
properly assessed the medical providers' opinions and that his
decision is supported by substantial evidence.

### A.   Weight Given to Treating Providers' Opinions

Pettigrew contends that the ALJ did not adequately assess
the opinions of his treating providers.  In his memorandum of
law, however, Pettigrew does not make any specific argument
regarding this issue, but instead merely recounts his medical
conditions and testimony, leaving it unclear which opinions he

believes were improperly assessed.[6]  Although the First Circuit

has held that "[i]t not [the court's] job to put flesh on the

bare bones of an underdeveloped argument," United States v.

Mathur, 624 F.3d 498, 508 (1st Cir. 2010), I will address the

ALJ's treatment of the opinions of Dr. Brummer, Pettigrew's only

treating provider who offered an opinion regarding his level of

functioning.

    A treatment provider's opinions must be given controlling

weight if the "treating source's opinion on the issue(s) of the

nature and severity of [the applicant's] impairment(s) is well-

supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other

substantial evidence in [the] case record . . . ."  20 C.F.R. §

404.1527(d)(2).  The ALJ "may reject a treating physician's

opinion as controlling if it is inconsistent with other

substantial evidence in the record, even if that evidence

consists of reports from non-treating doctors."  Coggon v.

Barnhart, 354 F.Supp.2d 40, 52 (D. Mass. 2005) (internal

_____

[6] In fact, the section in Pettigrew's memorandum that purports to
address the opinions of treating providers instead solely
appears to raise the issue, albeit in a perfunctory manner, of
Pettigrew's credibility.  Pl.'s Mem. of Law in Supp. of Mot. to
Reverse, Doc. No. 7-1, at 3-4.  I address this argument
separately.

quotation marks and citations omitted); see 20 C.F.R. §
404.1527(d)(2).

When a treating physician's opinion is not entitled to
controlling weight, the ALJ determines the amount of weight
based on factors that include the nature and extent of the
physician's relationship with the applicant, whether the
physician provided evidence in support of the opinion, whether
the opinion is consistent with the record as a whole, and
whether the physician is a specialist in the field.  20 C.F.R. §
404.1527(d)(1-6).  In addition, the ALJ must give reasons for
the weight given to treating physician's opinions.  Id.; see
also Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 4 (1st Cir. 2010).

Here, the ALJ gave no weight to the opinions of Dr.
Brummer, a physician who began treating Pettigrew on March 2,
2010.  Later that same month, Dr. Brummer assessed Pettigrew's
residual functional capacity, severely limiting his physical and
mental ability to work as a result of chronic fatigue syndrome
and stating that "[a]ny activity that requires more than brief
work periods cannot be done . . . ."  Tr. 290 (emphasis in
original).  In assigning no weight to his opinions, the ALJ
explained that Dr. Brummer examined Pettigrew on one occasion,

15

and that his opinions were inconsistent with the medical record
as a whole and in particular the endocrinology treatment notes.

The ALJ was justified in according Dr. Brummer's opinion no
weight.  See 20 C.F.R. § 404.1527(d)(1-6).  The nature and
extent of a treating provider's relationship with the claimant
is one factor that the ALJ must consider in determining the
amount of weight to give to a provider's opinion.  20 C.F.R. §
404.1527(d)(2).  Here, Dr. Brummer examined Pettigrew only once
in March of 2010, prior to making his assessment that Pettigrew
was unable to work as of September of 2008.  The short length
of the treatment relationship supports the ALJ's decision to
give Dr. Brummer's opinion no weight, especially given that Dr.
Brummer opined on Pettigrew's ability to function during the
year and a half before his single examination.

Further, Social Security Ruling 99-2p explains that
"detailed medical observations, treatment, the individual's
response to treatment, and a detailed description of how the
impairment limits the individual's ability to function over
time" are relevant in supporting medical opinions regarding the
effects of chronic fatigue syndrome.  SSR No. 99-2P, 1999 WL
271569, at *5 (April 30, 1999).  Dr. Brummer's treatment notes

16

and RFC assessments do not provide detailed medical observations, but instead merely present Pettigrew's statements during one office visit regarding the history of his symptoms.

Lastly, as the ALJ noted, Dr. Brummer's opinion that Pettigrew had severe chronic fatigue syndrome, resulting in overwhelming fatigue, lack of stamina, diffuse aches, severe irritability, dizziness, and an inability to complete tasks, concentrate, or think clearly, is not consistent with the treatment notes of Pettigrew's other providers.  For example, Dr. Tung's treatment notes do not reflect any severe irritability or other mental limitations.  Pettigrew reported to Dr. Tung in November of 2008 that he was feeling well.  Although he reported increased dizziness, increased appetite, trouble sleeping, shortness of breath, and irritability to Dr. Tung at a follow-up appointment in April of 2009, Pettigrew also explained that he began feeling better after adjusting his thyroid suppression regimen.  In May and November of 2009, Pettigrew told Dr. Tung that he had been feeling tired, but in January of 2010 he reported an improvement following medication regimen changes.  Similarly, Dr. Joshi, Pettigrew's treating provider who diagnosed him with chronic fatigue syndrome in January of

17

2009, did not note that Pettigrew was experiencing the severe symptoms that Dr. Brummer recounts.  Although Pettigrew's medical records indicate some limitations due to physical and mental impairments, substantial evidence in the record does not support a finding that they are as limiting as found by Dr. Brummer.  Therefore, it was within the ALJ's discretion not to credit Dr. Brummer's opinion.  See 20 C.F.R. § 404.1527(d)(2)-(4); Ortiz, 955 F.2d at 769-70; Graham v. Barnhart, No. 02-CV-243-PB, 2006 WL 1236837, at *6 (D.N.H. May 9, 2006) (medical opinion given less weight because it was inconsistent with the record as a whole).

**B.**   **The ALJ's Credibility Finding**

To the extent I can discern his counsel's arguments, Pettigrew also challenges the ALJ's assessment of his credibility.  Specifically, he appears to argue that the ALJ erred in not accepting Pettigrew's testimony that he frequently needed to lie down and rest due to chronic fatigue syndrome, precluding him from working full-time.

"[T]he extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of

18

the statements." SSR No. 96-7p, 1996 WL 374186, at *4 (July 2, 1996).  Assessment of a claimant's credibility is the exclusive province of the ALJ, who observes the claimant, evaluates his demeanor, and considers how his testimony "fit[s] in with the rest of the evidence." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  The ALJ's credibility determination is entitled to deference if it is supported by substantial evidence.  Id.  In determining the credibility of the claimant's subjective testimony, the ALJ must consider the entire record, including objective medical evidence, the claimant's statements, information provided by physicians and other witnesses, and any other relevant evidence. SSR No. 96-7p, 1996 WL 374186, at *1.

In assessing Pettigrew's disability, the ALJ found that Pettigrew's impairments could reasonably be expected to cause the variety of symptoms that he alleged.  Nonetheless, the ALJ determined that Pettigrew's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible.  Tr. 12.  Substantial evidence in the record supports the ALJ's credibility determination.

The ALJ first considered Dr. Tung's treatment notes, which
are inconsistent with Pettigrew's testimony regarding the
debilitating effects of his impairments.  Shortly after his
alleged onset date, in November of 2008, Pettigrew reported to
Dr. Tung that he was "feeling overall well" with no intermittent
illnesses within the prior six months.  Although in April of
2009, he reported increased dizziness, trouble sleeping,
shortness of breath, and irritability, Pettigrew also stated he
was feeling better, calmer, and able to sleep better after
changing his medication regimen.  When he complained of feeling
tired in May of 2009, he also admitted he was not adhering to
his medication regimen.  In January of 2010, he told Dr. Tung
that he was compliant with his medication regiment and reported
no symptoms apart from shortness of breath.  As the ALJ
reasonably concluded, these records show that, overall,
Pettigrew was generally doing well when on an appropriate
medication regimen, and that his testimony regarding the
severity of the symptoms of his impairments was, therefore, not
entirely credible.

In addition to medical opinions, the ALJ may consider
evidence that a claimant performs daily activities that are

inconsistent with a claimed disability.  See Avery v. Sec'y of
Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986).  "While
a claimant's performance of household chores or the like ought
not be equated to an ability to participate effectively in the
workforce, evidence of daily activities can be used to support a
negative credibility finding."  Teixeira v. Astrue, 755
F.Supp.2d 340, 347 (D. Mass. 2010) (citing Berrios Lopez v.
Sec'y of Health and Human Servs., 951 F.2d 427, 429 (1st Cir.
1991)).  Here, the ALJ noted that Pettigrew reported no
restrictions in the activities of daily living.  Pettigrew lived
alone and took care of his laundry, vacuuming, and housework.
Tr. 10.  The ALJ also considered the fact that in January of
2009, Pettigrew told a treatment provider that he was exercising
five to ten hours per week, including weight-lifting, but two
months later reported to the SSA that he could only exercise for
a far shorter length of time.  Id.  Yet another inconsistency
the ALJ considered in evaluating Pettigrew's credibility was his
statement at the hearing denying the use of drugs, although he
reported to Dr. Brummer that he smoked marijuana once a week.
Id.  Such inconsistencies further bolster the ALJ's finding that
Pettigrew's subjective complaints were less than credible.  See

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) ("[T]he resolution of conflicts in the evidence . . . is for [the ALJ], not for the doctors or for the courts.") (quoting Rodriguez, 647 F.2d at 222).

Considered together, the objective medical evidence, Pettigrew's own statements regarding his activities, and the inconsistencies between his statements and his providers' treatment notes are more than enough to meet the threshold of substantial evidence needed to support the ALJ's determination. Therefore, the ALJ's decision not to fully credit Pettigrew's statements regarding the severity of his impairments is entitled to deference.  See Frustaglia, 829 F.2d at 195.

## IV.  CONCLUSION

For the foregoing reasons, Pettigrew's motion to reverse the decision of the Commissioner (Doc. No. 7) is denied.  The Commissioner's motion to affirm (Doc. No. 9) is granted. Accordingly, the clerk shall enter judgment and close the case.

SO ORDERED.

/s/ Paul Barbadoro_____
Paul Barbadoro
United States District Judge

22

November 1, 2011


cc:   Peter J. Mathieu, Esq.
      Robert J. Rabuck, Esq.